**In re Harry Jay KATZ, Debtor.**

**Susan CROGE, Plaintiff,**

**v.**

**Harry Jay KATZ, Defendant.**

**Bankruptcy No. 95–18653DAS.**
**Adv. No. 96–0944DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 4, 1996.

M. Elizabeth Brigante, Joshua M. Briskin, Philadelphia, PA, for debtor.

Philip A. Yampolsky, Philadelphia, PA, for plaintiff.

Christine C. Shubert, Trustee, Tabernacle, NJ.

Frederic Baker, Philadelphia, PA, Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Since HARRY JAY KATZ ("the Debtor") has agreed to the nondischargeability of his indebtednesses to SUSAN CROGE ("the Plaintiff"), the only matter remaining at issue in the above-captioned adversary proceeding ("the Proceeding") is the Plaintiff's challenge to the Debtor's general Chapter 7 bankruptcy discharge. Finding that inaccuracies in the Debtor's Schedules were calculated to conceal his opulent lifestyle, we will sustain the Plaintiff's claims on the basis of 11 U.S.C. § 727(a)(4)(A).

### B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed his voluntary individual Chapter 7 bankruptcy case on November 3, 1995. Administration of the case was delayed because of a dismissal of the case due to the Debtor's apparent failure to file most of the Schedules, and reinstatement when it was discovered that most of the Schedules were apparently filed almost simultaneously with the dismissal order. On the deadline date for filing such claims, July 23, 1996, the Plaintiff filed the complaint in the Proceeding, challenging the dischargeability of her unliquidated claims against the Debtor which had been raised in pre-petition state court litigation on the basis of 11 U.S.C. §§ 523(a)(5), (a)(6), (a)(15), and the Debtor's general right to a discharge pursuant to 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4). The trial, originally scheduled on September 3, 1996, was ultimately continued to November 5, 1996.

The Debtor attempted to avoid the trial by, first, deleting the Plaintiff as a creditor from his Schedules, and second, agreeing to dischargeability of her particular indebtedness. Apparently, the Debtor perceived the first offer as a legitimate means of accomplishing the second end. The Plaintiff, however, rejected this offer and the trial of November 5, 1996, went forward.

The first witness at the trial was the Debtor, called as of cross-examination by the Plaintiff. The Debtor pleaded the fifth amendment in response to inquiries regarding his alleged applications for credit cards in the Plaintiff's name and his use of these cards to make certain purchases without authority from the Plaintiff. The Debtor admitted deposits of "family loans and gifts" of $61,000, in just the seven months prior to bankruptcy, into a checking account of Frankie Bradley's, Inc. ("the Bradley Account"), a corporation he testified was owned by his four children, which funds he subsequently withdrew and spent. The Debtor also maintained that the disclosures of his assets on his Schedules were accurate.

The second witness was Robert J. Gallagher, a CoreStates Bank ("the Bank") trust officer. Gallagher testified that the Bank was administering a testamentary trust created by the will of the Debtor's father of which the Debtor, his brother, and his sister were the beneficiaries. The trust was valued at $90,000; had a $22,800 cash balance; and, while realizing gross income of $93,864 from the sale of certain property in the past tax year, had resulted in distributions to the Debtor of only about $1,000 in each of the past three years.

The third witness was the Plaintiff. She testified that she has known the Debtor for about three years and was engaged to be married to him in December 1994. The engagement was broken on February 1, 1995, when the Debtor, allegedly influenced by cocaine and alcohol, physically attacked her and threatened to "blow [her] head off." The Plaintiff claimed that, despite her pursuit of a protection from abuse action, and court orders allowing her to recover all of her personal property, which she had moved into the Debtor's home, the Debtor refused to return most of her property, physically struck her when she tried to recover it, and, as noted above, without her authority, purposely took out credit cards in her name with American Express, Texaco, Amoco, First Union National, First U.S.A. Bank, and First Chicago National Bank, presumably in an effort to simultaneously enrich himself and ruin the Plaintiff's credit.

Perceiving that this evidence appeared sufficient to support the denial of dischargeability under § 523(a)(6),[1] which the Debtor had conceded prior to the trial, the court, near the end of cross-examination, asked the Plaintiff on what grounds she was also challenging the Plaintiff's general discharge. She then recited that she vigorously contested the accuracy of his Schedules, since the Debtor lived alone in a lavishly-decorated ten-room mansion, which includes, *inter alia,* a safe, a full room containing the Debtor's expensive wardrobe, an additional walk-in closet containing only his suits, and that he constantly wore expensive jewelry. She further stated that, during the courtship, he took her on numerous trips to resorts, gave her an expensive engagement ring which she returned, frequented first-class restaurants, and told her that, because of his ownership of the house and its contents, $3.4 million in cash, and his family's extensive holdings, including ten (10%) percent of a local tourist mecca, the village of New Hope, Pennsylvania, she could anticipate a life of luxury. Finally, the Plaintiff identified two businesses which he owned, Philadelphia Film and Video Commission ("Philadelphia Film") and National News Bureau ("National News").[2]

The Debtor's Schedules told quite a different story. They listed $150 cash and $100 worth of clothing as the Debtor's *only* assets. Schedule "I" lists the Debtor's income as "Unknown-varies," although Schedule "J" recites *$5,460* in *monthly* expenses (over $66,-000 annually), including insurance premiums totaling $1,739 (homeowner's or renter's $110, life $874, health $480, auto $250, umbrella $25); telephone bills of $900; and alimony and support payments of $1,600. The Statement of Financial Affairs ("the Statement") featured the following responses:

1. Amount of income—"Interfamily loans and gifts."

2. Payments to creditors—"None out of ordinary course of debtor's affairs."

3. Lawsuits—eight actions are referenced, but not that of the Plaintiff.

4. The responses to "Property Held for Another Person" and "Nature, Location and Name of Business" are "None."

The Debtor initially listed about 30 unsecured creditors, totaling about $513,000. One, National Penn Bank was in the amount of $320,000. None of the holders of credit cards allegedly opened in the Plaintiff's name by the Debtor without her authority, particularly Amoco, Texaco, First Union National Bank, First U.S.A. Bank, or First Chicago National Bank, are listed as creditors. An American Express debt which is listed on the Schedules was alleged by the Plaintiff to have arisen from the Debtor's own separate card.

On March 21, 1996, the Debtor amended his list of creditors to add about $42,400 of priority claims for taxes owed to the City of Philadelphia. On September 6, 1996, the Debtor again amended his list of creditors to omit the Plaintiff as a creditor. This action is consistent with his counsel's pre-trial assertion that this was a means of agreeing to the nondischargeability of the Plaintiff's debt, while preserving the Debtor's general discharge. No other amendments were made to the Statement or the Schedules.

In a post-trial colloquy the court noted that the Plaintiff's evidence of claims asserted under any provisions of 11 U.S.C. §§ 727 was rather sketchy. The Plaintiff nevertheless argued that §§ 727(a)(2)(B), (a)(3), (a)(4)(A), (a)(5), (a)(6)(A) were all implicated. We expressed particular concern about the Debtor's failure to so much as mention the trust, as well as about the reports of his other property holdings, citing the parties to our recent decision analyzing the debtors' duty to disclose a testamentary trust and other § 727(a) issues, *In re Blanchard,* 201 B.R. 108, 124–27 (Bankr.E.D.Pa.1996). The Plaintiff was given until November 15, 1996, and the Debtor until November 29, 1996, to submit post-trial briefs. Both parties sub-

---

1. The claims under §§ 523(a)(5), (a)(15) had no apparent merit, as the parties were never married and payment of alimony or a marital property settlement were clearly not in issue.

2. The record provides little indication of the nature of these businesses. The Plaintiff stated that she was appointed as the "beauty editor" of National News.

mitted their briefs early. Neither brief cited or discussed any cases except *Blanchard.*

## C. DISCUSSION

■ The Bankruptcy Code sections invoked by the Plaintiff, 11 U.S.C. §§ 727(a)(2)(B), (a)(3), (a)(4)(A), (a)(5), (a)(6)(A),[3] read as follows:

### § 727. Discharge

(a) The court shall grant the debtor a discharge, unless—

.   .   .   .   .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; ...

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account; ...

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

(6) the debtor has refused, in the case—

(A) to obey any lawful order of the court, other than an order to respond to a material question or to testify; ...

We will concentrate our discussion on § 727(a)(4)(A) because we find that a decision

in the Plaintiff's favor on the basis of this Code section is warranted, and this decision renders any further discussions unnecessary.

■ Since the parties become perhaps excessively fixated on the encyclopedic discharge/dischargeability analyses contained in the *Blanchard* decision, we will begin by quoting several pertinent principles therefrom. First, the Plaintiff was obliged to "prove every element of [her] claims by a preponderance of the evidence." 201 B.R. at 114 (numerous citations omitted). We also noted, *id.* at 120, that

all of the sections of § 727(a) must be construed liberally in favor of debtors. *See Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir.1993); and [*In re* ] *Segal,* ..., 195 B.R. [325,] at 332 [ (Bankr.E.D.Pa.1996) ]. In *Rosen, supra,* 996 F.2d at 1531, quoting H.R.REP. No. 595, 95th Cong., 1st Sess. 384 (1977), the court noted that Congress has described the § 727 discharge provisions as " 'the heart of the fresh start of the bankruptcy law provisions of bankruptcy law.' " *See also* [*In re* ] *Staffieri,* ..., 1994 WL 463978, at *2 [ (Bankr.E.D.Pa. Aug. 23, 1994), *aff'd sub nom. Obermeyer, Rebmann, Maxwell & Hippel v. Staffieri,* 1995 WL .339019 (E.D.Pa. June 5, 1995) ]. Thus, a denial of a discharge has been held to be " 'an extreme step ... not to be taken lightly.' " *Id.,* quoting *Rosen, supra,* 996 F.2d at 1531.

We also note at the outset a significant distinction between the proof required to establish §§ 727(a)(2) and (a)(4) claims as opposed to those raised under §§ 727(a)(3) and (a)(5). The former, §§ 727(a)(2) and (a)(4), require proof of an intent to injure the creditor and knowing and fraudulent action, respectively, while the latter, §§ 727(a)(3) and (a)(5), require no showing at all regarding the debtor's state of mind. *See* [*In re*] *Cook,* ..., 146 B.R. at [934,] 935–36 [ (Bankr.E.D.Pa.1992) ]; and *In re Trinsey,* 114 B.R. 86, 90–92 (Bankr. E.D.Pa.1990).

---

**3.** As only §§ 727(a)(2), (a)(3), and (a)(4) were cited in the complaint, it is not clear that the Plaintiff's claims under §§ 727(a)(5) or (a)(6)(A) could be considered. *See In re Cohen,* 139 B.R. 327, 332–36 (Bankr.E.D.Pa.1992) (amendment to

add a claim under a new Code section is permissible only when the factual allegations of the original, timely complaint supported the new grounds).

Speaking specifically of § 727(a)(4)(A), we stated, 201 B.R. at 127, that

> in order to establish a claim under § 727(a)(4)(A), a plaintiff must prove that the debtor (1) made a false oath or statement, (2) that was knowing and fraudulent, (3) which false oath or statement was material to the course of the bankruptcy case at hand. *See Segal, supra,* 195 B.R. at 332; [*In re*] *Henderson,* ..., 134 B.R. [147,] at 159–60 [ (Bankr.E.D.Pa.1991) ]; and *In re Woerner,* 66 B.R. 964, 971–72 (Bankr.E.D.Pa.1986), *aff'd,* C.A. No. 86–7324 (E.D. Pa. April 28, 1987).

The Debtor's pervasive omissions and misleading statements in his Schedules are simply too comprehensive to be passed off as incidental or accidental. With respect to the crucial issue of the credibility of the principal trial witness, the Plaintiff, as to the significant facts at issue, we find that she was highly credible as to these matters. Her justifiable anger and indignation at the Debtor's treatment of her was under control, although it had motivated her to act against her own apparent financial interests by challenging the Debtor's discharge when it would have seemed that the status in which the Debtor was allegedly willing to place her, as his only nondischargeable creditor (assuming other creditors were not similarly conveniently omitted, *but see* page 235 *infra*), would have been superior to her place as one of the Debtor's many creditors benefitting from denial of his discharge. In particular, we believe that her descriptions of the Debtor's lifestyle as that of the "rich and famous" was accurate. The contrast of this reality to the picture painted on his Schedules by the Debtor, which, as we noted at trial, was comparable to that of a resident of Passyunk Homes, a Philadelphia public housing project, was simply too graphic to let the Debtor pass.

As noted, the Debtor disclosed only $150 cash and $100 in used clothing as his sole assets. In so doing, he checked "None" to, *inter alia,* inquiries concerning his ownership of the following types of personal property: bank accounts, household goods and furnishings, art objects, antiques, and other collectibles, jewelry, firearms, interests in any incorporated or unincorporated business, contingent and noncontingent interests in any trust, and vehicles. The Statement declarations deny, *inter alia,* that the Debtor holds or controls property for another or has held any position, or was self-employed, in any business within two years of the bankruptcy filing. We believe that each and every one of these declarations were proven false or inaccurate if we credit, as we do, the Plaintiff's testimony.

The Debtor provided no testimonial rebuttal to the Plaintiff's testimony regarding his property and lifestyle. Much of the cross-examination of the Plaintiff was directed towards revealing shadowy aspects of her own lifestyle: alleged excessive alcoholic consumption, a prior broken marriage, hints of sexual promiscuity, implicit charges of her utilization of her physical attractiveness to obtain material benefits, and a mysterious action involving her prior employment at the University of Pennsylvania. The Plaintiff did not project nor proclaim herself to be an angel. However, the Plaintiff was only a medium of bringing aspects of the Debtor's case filing to the attention of the court. The only significance of the Plaintiff's own lifestyle was whether it rendered her credibility doubtful as to issues relevant to the matter at bar. We find no inconsistencies between her testimony and her allegations regarding the Debtor's lifestyle, and that her credibility on these matters was unshaken.

The defenses urged by the Debtor in his brief appear to be as follows: (1) the testamentary trust of which he is a co-beneficiary does not yield sufficient income to merit disclosure; (2) other persons (unidentified) may have had access to the Bradley Account; (3) the Plaintiff had no documentary support for any of her allegations regarding the Debtor's ownership or even possession of property other than the trust and the Bradley Account. In particular, it was noted that she did not establish who actually owned the Debtor's home and its furnishings. The Debtor argues that his statements to the Plaintiff regarding his wealth can be discounted because "the court can take Judicial Notice that a man smitten with a woman as attractive and alluring as [the Plaintiff] may

say anything to gain that woman's favor." Defendant's Memorandum in Support of Discharge, at 3; and (4) used clothing, no matter how expensive it was at purchase, has virtually no value.

■ As we stated in *In re B. Cohen & Sons Caterers, Inc.,* 97 B.R. 808, 817 (Bankr. E.D.Pa.), *aff'd in part & remanded in part,* 108 B.R. 482 (E.D.Pa.1989), *appeal dismissed,* 908 F.2d 961 (3d Cir.1990), *clarified on remand,* 1990 WL 2632 (Bankr.E.D.Pa. January 11, 1990), *aff'd,* 124 B.R. 642 (E.D.Pa.), *aff'd,* 944 F.2d 896 (3d Cir.1991),

> [w]e cannot emphasize strongly enough that it is important that debtors complete their Schedules accurately. *See In re Woodson,* 839 F.2d 610, 614–17 (9th Cir. 1988). They are, of course, prepared on a self-declaratory "honor system." *See id.* at 616; and *Payne v. Wood,* 775 F.2d 202, 204–07 (7th Cir.1985), *cert. denied,* 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986).

As stated in *In re Hicks,* 184 B.R. 954, 957 (Bankr.C.D.Cal.1995), "the debtor's duty of full disclosure ... is the *quid pro quo* for the fresh start provided by the discharge." Thus, the court in *In re Ingle,* 70 B.R. 979, 983 (Bankr.D.N.C.1987), appropriately observes that

> [u]nder 11 U.S.C. § 727(a)(4)(A), discharge is to be denied if "the debtor knowingly and fraudulently, in or in connection with the case ... made a false oath or account." The purpose of this section is to insure that debtors provide reliable information to those with an interest in the administration of the debtor's estate. *In re Shebel,* 54 B.R. 199, 202 (Bankr.D.Vt.1985); *In re MacDonald,* 50 B.R. 255, 259 (Bankr. D.Mass.1985). Creditors are entitled to truthful statements in a debtor's statement of financial affairs so that they may conduct their own investigations of those affairs. *In re Cycle Accounting Services,* 43 B.R. 264, 272 (Bankr.E.D.Tenn.1984). A material omission from a debtor's sworn statement of affairs or schedules presents grounds for denying a discharge under 11 U.S.C. § 727(a)(4)(A). *In re Chalik,* 748 F.2d 616, 618 n. 3 (11th Cir.1984); *In re Bobroff,* 58 B.R. 950, 953 (Bankr.E.D.Pa.

1986) [, *aff'd,* 69 B.R. 295 (E.D.Pa.1987) ]; *In re Cline,* 48 B.R. 581, 584 (Bankr. E.D.Tenn.1985).

*See also Miller v. Guasti,* 226 U.S. 170, 171, 33 S.Ct. 49, 49–50, 57 L.Ed. 173 (1912); *In re Godley,* 62 B.R. 258, 262 (Bankr.E.D.Va. 1986); and *In re Diodati,* 9 B.R. 804, 807–08 (Bankr.D.Mass.1981).

■ At least the existence of the trust of which the Debtor is a beneficiary should have been disclosed. *See Blanchard, supra,* 201 B.R. at 113, 124, 127; and *In re Braymer,* 126 B.R. 499, 502 (Bankr.N.D.Tex.1991). Our analysis of the nature of the trust causes us to conclude that it is not a "spendthrift trust." Under applicable Pennsylvania law, a spendthrift trust is defined as a trust " 'in which the interest of a beneficiary *cannot* be assigned by him *or* reached by his creditors.' " *Schreiber v. Kellogg,* 50 F.3d 264, 267 (3d Cir.1995) (emphasis added), quoting 2A A. SCOTT & W. FRATCHER, THE LAW OF TRUSTS 83 (4th ed. 1987). *Accord, Blanchard, supra,* 201 B.R. at 124. The will creating the trust at issue contains several provisions that preclude the trust's categorization as a spendthrift trust. First, Article 8(B) of the will, which is the only alleged spendthrift provision, recites only that claimants may not assign an "interest in income or principal." It does not prohibit the beneficiaries, including the Debtor, from assigning their interests in the trust, as is required in the aforesaid definition of a spendthrift trust.

■ However, the *Schreiber* court held that the Pennsylvania Supreme Court, if faced with the issue, would be likely to adopt the RESTATEMENT (SECOND) OF TRUSTS, § 157(c), at 328 (1967) ("the Restatement"). *Schreiber, supra,* 50 F.3d at 275. Therefore, it is logical to assume that the Pennsylvania Supreme Court would also adopt § 155 of the Restatement, *supra,* at 323, which categorizes a trust such as that in issue as a "discretionary trust." Since the will allows the trustees to expend corpus and income for the "health, maintenance and support" of the Debtor, it fits neatly within § 155. It is true that, since "an assignee or creditor of a beneficiary cannot compel trust-

ee to pay any part of the trust property to him," the effect of a discretionary trust under bankruptcy law is in many respects similar to a spendthrift trust. Nevertheless, the majority rule is that 11 U.S.C. § 541(c)(2), which excludes spendthrift trusts from the bankruptcy estate, applies only to what are technically spendthrift trusts. *See In re Comp,* 134 B.R. 544, 549 (Bankr.M.D.Pa. 1991); *In re Atallah,* 95 B.R. 910, 914 (Bankr.E.D.Pa.1989); *In re Hysick,* 90 B.R. 770, 772 (Bankr.E.D.Pa.1988); and *In re Babo,* 81 B.R. 389, 391 (Bankr.W.D.Pa.1988), *reconsideration denied,* 97 B.R. 827 (Bankr. W.D.Pa.1989). Therefore, the trust at issue appears to be property of the Debtor's estate which clearly should have been disclosed under 11 U.S.C. § 541(a)(1).

■ Moreover, as our decision in *Blanchard* indicates, the presence of even a spendthrift trust should be disclosed, although it is not property of the debtor's estate. *See also In re Portner,* 109 B.R. 977, 989 n. 8 (Bankr. D.Colo.1989); *In re Patterson,* 70 B.R. 124, 130 n. 3 (Bankr.W.D.Mo.1986) (while spendthrift trusts should be disclosed, their nondisclosure does not in itself mandate a denial of a discharge where the debtor rebuts the fraudulent intention of its omission).

■ The Debtor also should have disclosed his interest in Philadelphia Film and National News. All of a debtor's interests in business ventures must be disclosed, even if the debtor asserts that same are worthless, in order that the trustee will have a clear opportunity to investigate same. *See, e.g., In re Beauboeff,* 966 F.2d 174, 178–79 (5th Cir. 1992); *Chalik, supra,* 748 F.2d at 618; *Oldendorf v. Buckman,* 173 B.R. 99, 104–05 (E.D.La.1994); and *In re Gannon,* 173 B.R. 313, 320 (Bankr.S.D.N.Y.1994). Moreover, in his cross-examination of the Plaintiff, the Debtor's counsel placed significant emphasis on an assertion that Philadelphia Film had obtained health insurance for her. This assertion suggests that Philadelphia Film was a viable entity within a year of the Debtor's bankruptcy filing.

■ The Debtor's failure to disclose the Bradley Account is also significant. Substantial funds belonging to the Debtor admit-

tedly flowed in and out of that account, even if the account was not in the Debtor's name and other persons utilized it. Thus, in *In re Essres,* 122 B.R. 422, 427 (Bankr.D.Colo. 1990), *aff'd,* 139 B.R. 958 (D.Colo.1992), the debtors were cited for failing to disclose seven bank accounts which, though not in their name, were utilized by them.

■ The Debtor's failure to explain the right by which he holds the mansion in which he resides and the valuable personal property located therein are also very significant. If this property in fact belongs to another person or entity, which the Debtor did not identify, then, in light of the pervasive control which we find that the Debtor has over this property as the sole resident of the mansion, it should have been listed as property which the Debtor was holding for the entity or person who owns it. *See Braymer, supra,* 126 B.R. at 503. *Cf. In re Sanders,* 128 B.R. 963, 970 (Bankr.W.D.La.1991) (disclosure of debtors' home as owned by their children's trust, and hence held by them for this trust, was nevertheless found to be inadequate).

We also note that the Debtor listed ownership of no jewelry, including the valuable engagement ring returned to him by the Plaintiff. The guns which the Plaintiff testified that she saw prior to the Debtor's threat to use one on her are not identified. We also note that the Debtor ignored the portions of the questions which ask the amounts of his income and payments on indebtedness. Had these sums been listed, and, if listed accurately, they were likely to have been substantial, the trustee may have taken a more aggressive stance towards the Debtor.

The substantial nature of these amounts can be inferred from the Debtor's recitation of his monthly expenses of over $66,000 to support himself, including life insurance payments of $874/month, *see In re Vianese,* 192 B.R. 61, 71 (Bankr.N.D.N.Y.1996) (reduction of life insurance expenses from $750/month to $250/month still found excessive in a § 707(b) analysis); *cf. In re Smith,* 187 B.R. 678, 679 (Bankr.D.Idaho 1995) ($300/month for life insurance payments found excessive in a § 1325(b)(1)(B) analysis), and telephone expenditures of $900/month. *Cf. In re*

*Williams,* 201 B.R. 579, 580 (Bankr.M.D.Fla. 1996) (debtor's $150/month telephone expenses reduced to $75/month in a § 1325(b)(1)(B) analysis). It is inconsistent with the Debtor's lack of ownership or any legal interest in his home or motor vehicles to pay insurance on these items. The expenditure of $1,354 monthly in life and health insurance by a party with neither business ownership nor dependents residing with him is simply inexplicable.

The Debtor's apparent attempts to selectively list his creditors is also extremely problematic. A debtor has a duty to list all known potential obligations on the Schedules. *See Miller, supra,* 226 U.S. at 171, 33 S.Ct. at 49–50; *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 416–17 (3d Cir.), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988); *In re Baitcher,* 781 F.2d 1529, 1534 (11th Cir.1986); *In re Landes,* 195 B.R. 855, 862, *reconsideration denied,* 201 B.R. 399 (Bankr.E.D.Pa.1996); *In re Faden,* 170 B.R. 304, 308 (Bankr.S.D.Tex.1994), *appeal denied,* 96 F.3d 792 (5th Cir.1996); *Godley, supra,* 62 B.R. at 261–62; and 3 COLLIER ON BANKRUPTCY, ¶ 521.03, at 521–12 (15th ed. 1995). "It is not permissible for a Debtor to 'agree' to remain liable to an unlisted claimant who might rely on Code § 523." *In re Hubbard,* 96 B.R. 739, 750 (Bankr.W.D.Tex.1989). It appears to this court that this is exactly what the Debtor attempted to do as to his obligation to the Plaintiff. It appears likely that he also attempted the same gambit informally with the creditors from whom he fraudulently obtained credit cards in the Plaintiff's name, since it appears that few if any of them are listed on the Schedules. This improper, selective means of listing creditors may also explain why no other creditors have challenged the Debtor's discharge or dischargeability. He may have simply omitted all of his "problem" creditors from the Schedules.

We also note that, except for compounding the deficiencies in his Schedules by deleting the Plaintiff as a creditor, the Debtor made *no efforts* to correct the obvious defects therein in response to the Plaintiff's complaint or the mere passage of time, which would have permitted careful review of his initial submissions. *Compare, e.g., Baitcher,* 781 F.2d at 1531, 1534; and *Sanders, supra,* 128 B.R. at 973 (attempts at amendment were made, although even such efforts were found inadequate to protect the debtor's discharge). A debtor's willingness to amend his Schedules corroborates a good faith intention to complete the Schedules accurately. *See Woerner, supra,* 66 B.R. at 973–74. *See also Blanchard, supra,* 201 B.R. at 130. On the other hand, "the existence of more than one falsehood, together with the failure to clear up all the inconsistencies when filing amended schedules, may constitute reckless indifference to the truth, and, therefore, the requisite intent to deceive." *Oldendorf, supra,* 173 B.R. at 105.

We reject the four defenses urged by the Debtor in his brief, as articulated at pages 232–33 *supra.* The fact that the trust yielded a small amount of income was irrelevant. Failure to disclose its very existence precluded its investigation by the trustee.

Similarly, the disclosure of the Bradley Account was warranted. In that event, the sums deposited and withdrawn from that Account were so substantial that, had they been disclosed, they would have been likely to have sparked the trustee's interest. The Debtor was obliged to give some account of the disparity between his opulent lifestyle and his Schedules pleading poverty.

We certainly cannot take judicial notice that every or any man is prone to lie to his fiancée about his property holdings. Such misstatements seem particularly misplaced when addressed to a prospective spouse as opposed to a more casual acquaintance. The instant facts presented the unusual case where, despite the Plaintiff's apparent experience and sophistication, the Debtor's recitations of extremely valuable property ownership were eminently believable, given his lifestyle.

Finally, although the trustee was unlikely to attempt to liquidate the Debtor's clothing, the obligation of the Debtor was to make a full disclosure of the extraordinary amount and quality of same in order to allow the trustee to make such a decision intelligently.

The very low value estimate ($100) appears out of line in light of the Debtor's wardrobe, as credibly described by the Plaintiff. Other items mentioned by her, such as jewelry and objects of art, are quite susceptible to liquidation and clearly should have been disclosed.

Finally, we return to the tripartite criteria which the Plaintiff in a successful § 727(a)(4)(A) proceeding must prove, quoted from *Blanchard, supra,* 201 B.R. at 127, at pages 231–32 *supra.* Clearly, significant false and misleading omissions were included in the Debtor's Schedules. *See Henderson, supra,* 134 B.R. at 159 ("omission of assets resulting from the debtor's reckless disregard for the truth is equivalent to fraud under § 727(a)(4)(A) (citations omitted))."

Secondly, the false statements and omissions were material. *Compare Landes, supra,* 201 B.R. at 410 (failure to disclose modest income and a few assets of apparently modest value may not be sufficiently material to warrant a denial of discharge in themselves; discharge denied on other grounds); and *Segal, supra,* 195 B.R. at 332–34 (debtor's falsehoods regarding his role in a previous business venture held not sufficiently material to bar a discharge because the business had terminated several months prior to the debtor's bankruptcy filing).

The significant misstatements and omissions here were far more comprehensive and thus material than those at issue in another case where we denied a discharge on the basis of § 727(a)(4)(A), *In re Freedman,* 1994 WL 455030, at *3–*4 (Bankr.E.D.Pa. August 19, 1994), *aff'd,* 1995 WL 118217 (E.D.Pa. March 9, 1995). *Freedman* involved relatively modest understatements in the debtor's income, and the failure to disclose a bank account containing only $1,269. The Debtor's misstatements here could, as we found in *Freedman,* be easily attributable to an attempt to avoid a dismissal of his

bankruptcy case under 11 U.S.C. § 707(b). *See id.* at *5.[4]

As to the "knowing and fraudulent" prongs of § 727(a)(4)(A), we find, as in *Freedman,* that "an accumulation of falsehoods add [sic] up to an intent to deceive." 1994 WL 455030, at *5. *See also Henderson, supra,* 134 B.R. at 159 (reckless disregard for truth is the equivalent of fraud). The instant facts are easily distinguishable from those of *Blanchard, supra,* 201 B.R. at 127–132, where the misstatements by the debtor were found insufficient to establish any substantial wealth of the debtors and all of their property appeared exempt or unlikely to merit a trustee's attention. By way of contrast, the Debtor's trappings of significant wealth, and omissions of many types of property which may well have attracted the trustee's attention, present a far different set of facts. We find that the Debtor systematically, consistently, unrepentantly, and therefore knowingly failed to schedule assets or list creditors for the express purpose of avoiding further investigation of his affairs, which constitutes fraud under § 727(a)(4)(A).

### D. CONCLUSION

For all of the foregoing reasons, we will enter an Order granting the Plaintiff the full panoply of relief that she seeks, denying the Debtor's discharge as well as declaring the Debtor's obligations to her non-dischargeable.

### ORDER

AND NOW, this 4th day of December, 1996, after the trial of the above-captioned proceeding on November 5, 1996, the Debtor having conceded the nondischargeability of his indebtedness to the Plaintiff, upon consideration of the parties' briefs addressing the issue of the Debtor's right to a general dis-

---

4. The large amount of cash passing through the Debtor's hands, over $60,000 annually just on the basis of his expenses claimed in Schedule "J," *see* page 230 *supra,* could support a § 707(b) motion. For this reason, this court, aware of its duty to act *sua sponte* under § 707(b), felt obliged to ask the Plaintiff about the Debtor's property holdings, despite the failure of the

Plaintiff to emphasize same in her prior testimony. On the other hand, this court is reluctant to invoke § 707(b) in the context of this creditor-initiated proceeding. *See In re Latimer,* 82 B.R. 354, 363 (Bankr.E.D.Pa.1988) (creditor's presentation of facts supporting a § 707(b) motion to the United States Trustee or the court may "taint" such a matter).

charge, it is hereby ORDERED AND DE-CREED as follows:

1. Judgment is entered in all respects in favor of SUSAN CROGE ("the Plaintiff") and against HARRY JAY KATZ ("the Debtor").

2. The discharge of the Debtor is DENIED, as well as the dischargeability of the Debtor's specific obligations to the Plaintiff.

3. In light of this disposition, a status hearing in this case, at which it will be determined whether it can be closed upon our review of the counsel fees charged to the Debtor, or whether it is now believed that the Debtor has assets which could be liquidated for the benefit of his creditors, to be attended by the case trustee, Christine C. Shubert, Esquire, is scheduled on TUESDAY, DECEMBER 17, 1996, AT 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 4 (Room 3620), Third Floor, United States Court House, 601 Market Street, Philadelphia, PA 19106.

4. The Debtor's former counsel, M. Elizabeth Brigante, Esquire, and his present counsel, Joshua M. Briskin, Esquire, are directed to file, serve, and notice their applications for any compensation received or promised to be paid in excess of $500 in connection with this case, paid from any source whatsoever, in accordance with Local Bankruptcy Rule 2002.2, on or before December 13, 1996. A copy of any such applications filed shall also be served upon this court in chambers on or before December 13, 1996.